[Cite as *BD Dev. v. Vandalia* , 2014-Ohio-2996.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| BD DEVELOPMENT | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.  25930 |
| v. | : | T.C. NO.  12CV8691 |
| CITY OF VANDALIA, OHIO, et al. | : | (Civil appeal from Common Pleas Court) |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the     3rd     day of      July     , 2014.

. . . . . . . . . .

TERRY L. LEWIS, Atty. Reg. No. 0010324, 10 W. Second Street, Suite 1100, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

MICHAEL W. SANDNER, Atty. Reg. No. 0064107 and JOSHUA M. KIN, Atty. Reg. No. 0086965, 2700 Kettering Tower, Dayton, Ohio 45423
        Attorneys for Defendants-Appellants

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of the City of Vandalia, the City of Vandalia Board of Zoning Appeals, and the Council of the City of Vandalia ("the City").   The City appeals from the August 27, 2013 decision of the

Montgomery County Court of Common Pleas, on the administrative appeal of BD Development ("BD"), in which the court found, after a hearing to adduce additional evidence, that a zoning ordinance requiring BD to pave its lot with a "hard surface" is not unconstitutionally vague, and that BD complied with the ordinance by paving the areas with compacted gravel.

{¶ 2}     The record reflects that Robert Vann, the owner of BD Development, requested a parking lot variance for his property located at 1001 S. Brown School Road in March of 2009.   The minutes of the meeting before the April 8, 2009 Vandalia Board of Zoning Appeals   ("BZA") reflect as follows:

> * * * Mr. Vann explained how he bought the property in 2007 and completely turned the property around.   Towards the end of 2007, Mr. Vann constructed a new garage to the rear of the property, which he recently opened as a service garage to serve the public.   Fire inspections were done at the property on the first of March, and it was questioned whether or not the city was aware of the new business.   Mr. Vann and Mr. Anderson spoke about the new business and arranged for Ms. Vogel to come out and review zoning on the site.   There was a substantial expansion of parking and maneuvering areas that were gravel.   Ms. Vogel told Mr. Vann that gravel parking and maneuvering areas are not permitted and would have to be brought up to code.

> Mr. Vann said that he received an occupancy permit from the City and he was never aware of this requirement.   He called the City in June for an

occupancy permit and they told him the zoning had to be finalized. An occupancy permit for the building was issued in July. The applicant said that he had the gravel put down in May, spending $60,000, and planned to install the pavement in 10 years or so, once the economy turns around. The applicant added that in order to install pavement he would have to throw out the existing gravel. Mr. Herbst stated that some of the gravel could be used for a base under the pavement. The applicant stated that some of the gravel would be used, but some would have to be taken away to accommodate the new pavement.

Ms. Vogel stated for the record that there is false information in the application for the variance. Mr. Vann was granted a permit for the new building and there was no indication of expanded parking on the drawings. However, there was a note on the drawings that all parking/driveways were to be paved. Our inspectors were not aware of the gravel parking areas until the Fire Inspection was done last month. Ms. Vogel further added that this is a requirement of the Zoning Code, not the Building Code, and the new use associated with the property would make it necessary to assume compliance of any non-conforming issues associated with the site. Mr. Vann asked if he took away the new use, would gravel still be permitted, Ms. Vogel said that it was never approved as gravel parking, it would still be a violation of the Zoning Code.

Ms. Vogel added that either way the Board decides to vote on the

variance, the city would need to see a plan for the parking lot which addresses drainage on the property. This was stated in the memo from staff. The City Engineer will review the drainage plans when submitted.

A letter was received by the City from a business located in front of Mr. Vann's property (to the east on Brown School Rd.), they were not able to make the meeting, but they wanted to address their concerns. It states that since parking areas have been constructed, they have been experiencing severe water runoff from that property (the letter is attached). Mr. Vann said this is the first he was aware that the drainage was an issue and said the adjacent property has never addressed those concerns to him. Ms. Vogel said that we also just received the letter and were made aware of this, however, the zoning code requires that there are no adverse effects on adjacent properties and parking is designed for adequate drainage per Section 1280.08(g)(2).

{¶ 3} At the conclusion of the meeting the BZA voted to approve the variance, and subsequent correspondence to Vann from the City Council provides that "your variance request was granted as a temporary variance until October 1, 2012 during which the current property owner * * * * would not be required to pave the existing gravel parking areas," and an "application shall be re-submitted for the variance on or before the expiration of the temporary variance (October 1, 2012)."

{¶ 4} The record reflects that Vann applied for a "variance to allow gravel paving" on September 10, 2012. He attached his March, 2009 initial application. The record

reflects that the BZA unanimously recommended denial of the request on September 26, 2012 "because the Board found that the minimum variance to afford relief was not to indefinitely maintain gravel parking on the site." The minutes of the meeting reflect in part as follows:

> Mr. Vann explained that he can't afford to pave the site. He said he already went through the expense of redirecting drainage on the site to address the complaint of a neighbor directly to the east. He said it would cost him an additional $24,000 to provide drainage retention for the site if he paved all of the gravel. He has received a total estimate for asphalt and engineering of $175,000, if he would have to pave the gravel areas.

> Ms. Vogel said that Mr. Vann did hire an Engineer to address the drainage concerns on the site. The City Engineer, Mr. Galvin, worked with Mr. Vann's consultant and the drainage system has been installed effectively. Mr. Galvin indicated that the runoff rates are diminished presently with the gravel condition; however, the system was designed with the intention of it being paved in the future. Ms. Vogel said she would have to discuss with the City Engineer whether or nor detention/retention would be required on the site.

{¶ 5} The record contains "Workshop Minutes" reflecting meetings that the BZA held to discuss the variance request for a permanent gravel parking lot on October 15, 2012, October 22, 2012, and November 5, 2012.

{¶ 6} A hearing was held before the City Council on November 19, 2012.

Counsel for BD argued as follows:

* * *

It is a unique property. And like all regulations I think the regulation has to be applied based on the uniqueness of how it will be applied on a particular business, particularly a commercial property like this. And the reason this particular property is unique, it is on a somewhat downhill slope, not a major downhill slope but it's downhill slope enough that when it does rain, there is a substantial amount of water runoff down the roadway.

It does not affect my client's property, but part of the reason it doesn't affect it is because the water is then running into the gravel parking lots and being absorbed and not going on downhill to Brown School.

Another thing that makes the property unique is it cannot be seen from the roadway except for that private drive so it doesn't affect anyone. The third thing is most of the parking here is not for employees. It's for trucks that simply come in there and park for long-term parking.

And as you're aware, they've divided the four areas into A, B, C, and D; and C and D are the two areas which has long-term parking where trucks generally just stay and really I cannot see any basis at all for paving those particular areas.

Miss Vogel has already acknowledged to the council that there is no dust problem out there and I believe it's already been acknowledged that there have been no complaints upon my client's property. So based upon the

uniqueness of it we are requesting that you grant us at least a partial variance and to that extent we talked briefly I think at our meeting about paving various sections and the various alternatives.

My client has looked at his finances and that has been the major issue here. Because of the economy, he just cannot get the money to do all the necessary paving that he is not required to do. He would - - he's more than agreeable to paving section A by 2014, November, and we picked that day I think because Mr. Brusman indicated that that would be an appropriate time in terms of the weather and it should be completed by then. We find it should be completed by then. We find it somewhat difficult though * * * financially to do area B within this particular time frame.

And I think we all agree, area B was previously gravel to begin with. It's been grandfathered in, with the exception of the fact that my client added an additional ten feet beyond the end of the building. If that is an issue with the Council, my client has indicated to me that he is willing to do one of two things, either asphalt that last little ten feet or just to dig the gravel up and go back and plant grass seed there as it originally was when he purchased the property. Because the original gravel was there up to the edge of the building and as you can see from the photograph, it extends approximately ten feet now beyond the building.

Area C and D, again, they - - it would be just inappropriate because the water runoff is going to be tremendous if those particular areas are paved

and right now they are absorbing a lot of the water coming down the hill on that roadway. And they're not being used for any purpose at all except other than parking trucks there for the long-term.

Based on those things I don't really think I need to reargue the issues that we litigated and the things we talked about in our meeting. But because the uniqueness of the property we would ask you to grant the variance. At least partially if you wish to ask my client to pave area A by November 14th, we're more than willing to do that.

He thinks he can financially obtain those funds, but we would ask first off that area C and D just be granted a variance because it just - - we don't see any basis for revisiting it in three years. It's not going to change. It's been there for three years. And the water runoff is not going to change in the next three years. And with respect to area B, we're going to either need a further extension or grant a   - - order my client to just remove that ten feet of extra gravel that he added to it and go back to the original gravel that was there.

* * *

{¶ 7}   Mr. Galvin then was asked by Mayor Setzer to explain the water runoff situation on Vann's property. He stated as follows: "* * * about three years ago [BD] hired Mad River Engineering to design a system that would handle the storm water runoff from the site and Mad River did a very good plan and likewise the contractor did a very good job of installing it. I've witnessed the operation of that storm system and it functions very, very well." Galvin stated that the "designer advised me that he was in fact sizing the pipes in

such a way to handle a future paved condition on the site." Galvin stated that area C, however, is not controlled by the drainage system, and "the system as designed would handle everything to be paved aside from area C." He stated that area C "drains to the east into the vacant lot," and if it were paved, "my calculation is that it would increase the runoff by about 34 percent."

{¶ 8} In its "Notice of Decision on Variance," after noting that the BZA unanimously recommended the variance be denied because the BZA "found that the minimum variance to afford relief was not to indefinitely maintain gravel parking on the site," the Notice sets forth the criteria for approving a variance in Vandalia Code section 1232.04(e) as follows:

(1) That there are unique physical circumstances or conditions, including irregularity, narrowness or shallowness of lot size or shape or exceptional topographical or other physical conditions generally created by this Zoning Code in the neighborhood or district in which the property is located;

(2) That because of such physical circumstances or conditions, as identified in division (e)(1) of this section, there is no practical possibility that the property can be developed in strict conformity with this Zoning Code and that the authorization for a variance is, therefore, necessary to enable the reasonable use of the property.

(3) That no hindrance to strict conformance to this Zoning Code has been created by the applicant;

(4) That the variance, if authorized, will not alter the essential chracter of the neighborhood or district in which the property is located, nor substantially or permanently impair the use or development of adjacent property, nor be detrimental to the public welfare;

(5) That the variance, if authorized, will represent the minimum variance that will afford practical relief from a lot development standard[.]

**{¶ 9}** The Notice concludes as follows:

At the City Council meeting held on November 19, 2012, your variance request to indefinitely maintain gravel parking was also denied for the same reason the BZA denied the variance, and in addition because Council did not find that there is a water runoff issue that would meet the criteria in 1232.04(e)(1). However, Council did grant you another temporary variance for additional time in which to comply with the code by giving you until November 1, 2014 to pave Areas A and B (on the attached map), and if that is timely accomplished, giving you until November 1, 2015 to pave areas C and D.

**{¶ 10}** We note that BD filed its notice of administrative appeal on December 12, 2012, and that on January 25, 2013, it filed a "Motion to Stay Briefing Schedule and to Permit Hearing to Adduce Further Evidence," pursuant to R.C. 2506.03. According to BD, the "testimony adduced as part of the administrative proceeding was not given under oath," BD "was not afforded the opportunity to cross-examine witnesses," and "the administrative bodies involved failed to enter and include in the transcript adequate and appropriate

conclusions of fact supporting the final order, adjudication or decision at issue herein."

{¶ 11} The City filed a memorandum in opposition to BD's motion on March 8, 2013, in which it asserted that it opposed BD's request "as BD failed to preserve these errors for appeal, BD Development was NOT denied the opportunity to cross-examine the witness, and, though the City's conclusions of fact are present, no factual determinations were necessary in the denial of BD Development[']s variance request." The City concluded, "[b]ecause the deficiencies outlined in O.R.C. § 2506.03 are not apparent on the face of the transcript, BD Development has not supplied an affidavit asserting that a deficiency occurred, these procedural deficiencies were waived, and additional evidence is not necessary."

{¶ 12} On March 21, 2013, the court sustained the City's motion to stay briefing as follows:

> * * * Although Appellees filed their opposition late, this Court considered the arguments made within.
>
> After a review of the transcript of the proceedings and the briefings filed, the Court finds that the testimony of witnesses were not given under oath. The Court also finds that Appellant has not waived any procedural defects, since such defects are being raised on the first appeal. Furthermore, the Court finds that hearing additional evidence would be useful in the determination of this case.

{¶ 13} On July 17, 2013, BD filed "Appellant's Prehearing Statement." BD asserted that its "use of compacted concrete complies with Vandalia Zoning Regulation

1280.08(g)(1)," which provides: "The surface of any parking area, aisle, driveway or maneuvering area shall be hard-surfaced, paved with concrete, asphaltic concrete or other hard surface and approved by the Administrative Officer." BD further asserted that "Vandalia Zoning Regulation 1280.08(g)(1) is void for vaguenes with respect to the term 'hard surface.'" Finally, BD asserted that a "zoning ordinance may not be enforced against a citizen where it serves no reasonable, equitable purpose and has no substantial relationship to public health, safety or welfare."

{¶ 14} On July 18, 2013 the court heard testimony from Vann and Galvin and admitted 59 exhibits from Vann and three from the City. Vann testified that the material at issue in his parking lots is "what I call chip and dust, crushed, hardened concrete aggregate." Vann identified an aerial photograph of his property, prepared by the City, that delineated areas A, B, C, and D that the City wants him to pave. The map reflects that area A is comprised of 12,000 square feet and is used for parking and maneuvering. The map reflects that Area B is comprised of 7,400 square feet and is used for truck parking and maneuvering. Area C is comprised of 13,000 square feet and is used for long term trailer parking, and Area D is comprised of 8,000 square feet of truck parking and storage. Vann stated that he remodeled an existing building and that he also constructed a new building on the site. Thereafter, he stated that he contracted with Mike Wagner, who began delivering gravel in May, 2008, prior to Vann receiving final occupancy permits. Vann stated that he received two final occupancy permits in July, 2008, which he identified. One provides, "* * * At the time of issuance this structure was in compliance with the various ordinances of the City regulating building construction or use for the following: * * * Alteration:___X___."

The other permit provides:"* * * At the time of issuance this structure was in compliance with the various ordinances of the City regulating building construction or use for the following: New:＿＿X＿＿."

**{¶ 15}** Vann testified that he decided to open a garage for trucks in his new building, and that he so advised the City via email in December, 2008. He testified that a City representative came to the property to perform a fire inspection, and the following exchange occurred:

Q. I see. And what happened then?

A. When they come out and done a fire inspection, then they noticed that we had a garage in there, and they said that we needed to design all new plans and get that authorized because it's a completely different business. And we had to hang a sign and we needed to get a hold of zoning in order to see if the sign and the parking was going to be fine for the new business.

* * *

Q. * * * What then occurred?

A. Well, at that time, Erika Vogel come out to check on the parking and the sign, and she said we were fine on our parking, we were fine on what we were doing a sign (sic), but all the gravel had to be blacktopped.

Q. Okay.

A. That kind of floored me because that's the first I had ever heard that with all the inspectors and everything being out.

Q. Had the condition of the parking area with all the graveling

changed before you got your occupancy permit?

A. No.

Vann stated that he subsequently closed the garage business, but that Vogel said he "still had to blacktop all the areas that had already been completed."

{¶ 16}  Vann stated that he received the three year variance.  He stated that he attempted and was unable to obtain financing to pave the area.  Vann testified that if the areas were paved, he anticipated "a serious water problem because we have that as it is right now.  When it rains, the topography of where we're at collects a lot of water and at the end of my driveway it's completely - - it's like a river flooding in there all the time when it's raining." He stated that it would cost $118,000 to complete the paving in asphalt to the City's specifications.  Vann stated that heavy commercial trucks sink into asphalt on hot summer days.  Vann stated that commercial concrete is "about ten times the price" of asphalt.  He stated that the "chip and dust" absorbs rainwater, and he identified Exhibit 58, which depicts a smooth surface resembling concrete.  Vann testified, "it's raining that day and I'm trying to show you how hard a surface that is.  That's not just gravel.  That chip and dust becomes almost concrete." The following exchange occurred after Vann identified Exhibit 59, which depicts the same area depicted in Exhibit 58:

A.  Yeah, the reason I took this picture is once again to show you how hard the surface is of that, that's just not regular gravel that's sitting there.

If you notice the tire tracks around here, (indicating) this is where a sixty or seventy thousand pound trailer has come in and spun around and the

only thing it left was the tire tracks that it would leave on blacktop temporarily. It's not - - it did not dig down into that gravel or that concrete surface.

Q. So that surface is hard enough that the tires of a - - how much weight?

A. Oh, that trailer there that come across there had at least sixty thousand, anywhere from sixty to eighty thousand.

Q. Doesn't even - -

A. No.

Q. - - create a groove in the - -

A. No.

Q. - - crushed concrete or whatever that surface is?

A. Yeah, in the chip and dust.

{¶ 17} The following exchange occurred on cross-examination regarding Exhibit 59:

Q. Picture's not real clear, but [it] does appear that there's chunks of material on the ground, correct?

A. I mean not what you'd consider chunks, it's - -

Q. It's not smooth is it?

A. It's not smooth as concrete, but it's pretty smooth.

Q. And, in fact, * * * you point out earlier that you backed a truck up and it left impressions?

A. No, the truck come in there and spun around the  - - and left - -

Q. Left impressions in the gravel?

A. Uh-huh.

* * *

Q. What's the maintenance requirements for a driveway or parking lot made of this material?

A.  Well, if it develops any holes or anything like that you just replace it and it's pretty simple.

Q. * * * But you would get depressions in it and that you'd have to fill in?

A. Yes.

Q. Or water would pool?

A. Yeah.

Q.  It would start to deteriorate at some point and become more crumbly, correct?

A. Yeah. It's holding up better than my blacktop. Yeah.

* * *

THE COURT: Much like potholes in asphalt?

* * *

A. Yes.

* * *

THE COURT: I'm looking for your point in bring[ing] that up?

\* \* \*

THE COURT: It develops potholes much like asphalt does?

MR. KIN: Correct, but it also deteriorates.

THE COURT: Well, as asphalt does.

MR. KIN: And becomes dusty and crumbly.

\* \* \*

A. No, we don't have dust problem or a crumbly problem.

Q. Not right now?

A. No, and we didn't. As I said my blacktop has wore out more than this stuff.

{¶ 18} On re-direct examination, Vann testified as follows regarding his asphalt driveway:

\* \* \* The driveway here has deteriorated down really bad and that's had four inches [of asphalt] on it. I understand it when Mr. Brusman said, I didn't realize it when they were selling me the product, but I understand now why he said that should have had eight inches because that's all crumbled, I mean you can go out and pick it up with your hands it's crumbled so bad.

{¶ 19} The following exchange occurred on re-direct examination:

Q. \* \* \* but the primary issue is under the ordinance it talks about hard surface. Is there some way you can describe to His Honor how hard this surface is with respect to where you what you call chips and dust?

\* \* \*

A.  I would describe it to is (sic) being like concrete.  I mean it's solid, it doesn't give.   It's not like blacktop.

The weather really doesn't affect it at all, you don't have any problem with ice setting up on it.   It's not - - there's no dust, I mean - -

Q.  I'm talking about just hardness because the statute requires a hard surface?

* * *

A.  Well, I believe that one picture would really show that where that truck was turning around.  Normally when you get a truck to turn round in that tight of an area on blacktop it will just eat the blacktop right up.

You can see there are some marks there, but there - - it's not like they're sunk down.   It's like on a hard surface that you're on all the time. * * *

Q.  So the only thing you can compare it to is what we often refer to as poured concrete?

A.  Yes.

Q.  And there's nothing in the statute that requires poured concrete, does it?

A.  No, I'm not - - I think the statute only says concrete, or asphalt or hard surface.

{¶ 20}  Robert Galvin testified regarding the drainage system on BD's property. On cross-examination regarding the gravel parking lots, the following exchange occurred:

Q. * * * Is what's there now, is it a hard surface?

* * *

THE WITNESS: Well, you know, hard is a relative term. * * * it's not asphalt, it's not concrete. It's compacted gravel.

BY MR. LEWIS: It's a vague term, isn't it?

A. Yeah, it's * * *

* * *

Q. Is it a hard surface , sir?

A. It's harder than some things. It's not hard as concrete or asphalt. If it - - you're asking me a relative question. It's soft. I'm going to say it's soft.

{¶ 21} The City filed a post-hearing brief on August 8, 2013, asserting that the "City's Zoning Code requires parking surfaces to be paved with concrete, asphaltic concrete, or another similar hard surface - not gravel." The City further asserted, "[r]egardless, Mr. Vann and [BD] created the hardships now complained of by negatively failing to consider the zoning restrictions to such a vast resurfacing project." Finally, the City asserted that BD "is not entitled to a variance for allowing a gravel parking lot."

{¶ 22} BD filed a reply on August 19, 2013, which provided in part as follows:

It has never been refuted * * * that the City inspected Appellant's property and issued first a temporary occupancy permit and later a final occupancy permit, all of which require inspection. Respondents now suggest that the parking lots were somehow hidden during these inspections, the appropriate response for the City is to discuss this matter with its own

inspectors and determine why they were unable to see a change in the open and obvious parking areas on Appellant's property.

{¶ 23} BD denied that it created the drainage problem, and it denied that it can be handled by the existing drainage system. BD asserted that the City mischaracterized the language of the ordinance at issue in its brief. BD asserted that City Planner, Erika Vogel, conceded that there is not a dust problem due to the gravel. BD asserted that it is in compliance with the statute. BD asserted that it is cost prohibitive to pave the parking lots.

{¶ 24} The trial court's decision reflects that it allowed additional evidence due to the fact that the testimony adduced before the City Council was not given under oath. The decision provides in part as follows:

Here, the Court finds that further analysis of constitutionality is unnecessary, since it does not find the ordinance impermissibly vague. The ordinance clearly sets forth two examples of acceptable surfaces for parking: concrete and asphaltic concrete. There are other, assumedly acceptable, "hard" surfaces that may be used to pave a parking lot. By requiring "hard surfaces" to be used in paving off-street parking, the statute implicitly dictates that "soft" surfaces, like grass, dirt, and rubber mulch, are otherwise unacceptable materials for paving. Therefore, the Court finds that the ordinance does give a person reasonable notice as to its requirements.

This determination brings the Court to the consideration as to whether gravel constitutes a "hard" surface, where there is no definition for "hard surface" within the City's Ordinances. Without a separate codification of

"hard surface", this becomes a question of fact rather than of law. At the hearing, evidence was presented that the zoning ordinance requires off-street parking surfaces to be paved with "concrete, asphaltic concrete, or other hard surface". The evidence showed that the surface employed by BD was "hard", being composed of a compacted gravel material. The evidence also showed that BD used the gravel in a manner as to "pave", which is to cover and make firm, the surface which i[s] to become a parking lot. By these facts alone, the Court finds that BD has complied with the ordinance.

The City argues that grave[l] is not the type of "hard surface" which is contemplated by the ordinance. First, it argues that materials like gravel, brick, stone, and wood are all out-dated and uncommon materials in this technologically advanced world. Furthermore, the City argues that the use of "concrete" and "asphaltic concrete" narrow the term "other hard surface" to like substances. The Court finds this interpretation unlikely. Specifically, the City's witness was unable to articulate what "other hard surface" might be but for concrete or asphalt, in the face of BD's proof - which the court accepts - that the surface it used was hard. The Court finds that the drafter's choice not to further delineate other types of "hard surfaces" was to allow types of hard surfaces which are not concrete and/or asphaltic concrete.

The Court finds that the use of gravel as a "hard surface" does not affect any legitimate governmental interest or interest of any neighbors. Governmental intrusion into the rights of owners of property cannot be

justified by what was shown to be nothing more than a pointless insistence by the City that a property owner abide by the City's own questionable interpretation of its zoning ordinance, without showing any cause for doing so but perhaps to indulge a display of power to one daring to question it. Additionally, the use of gravel in this instance did not cause a dust issue, did not cause a drainage issue nor any other safety issue to anyone else, and was otherwise a legitimate use by BD of its own property.

In footnotes the court indicated as follows: "By reason of the lack of articulation of any evidence to this point, the Court can only speculate that bare earth, wood chips, or perhaps loose crushed rocks - not gravel- might not meet the ordinance requirement for 'hard,'" and "In holding that, under the ordinance in question, the surface used met the zoning provision, the Court does not reach whether the variance sought ought to have been granted, though in making findings as it has regarding the lack of dust, drainage and safety issues, such would appear to be appropriate."

**{¶ 25}** The court's decision concluded as follows: "By the foregoing analysis, the Court finds that the term 'hard surface' includes the surface being used by BD Development. Since the Court finds that BD Development has complied with the City of Vandalia Ordinance § 1280(g), a permanent or temporary variance is not required."

**{¶ 26}** The City asserts two assignments of error herein. Its first assigned error is as follows:

THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF ADDITIONAL EVIDENCE BECAUSE ANY PROCEDURAL ERRORS IN THE

ADMINISTRATIVE PROCEEDINGS WERE WAIVED.

{¶ 27}  R.C. 2506.03 provides in relevant part as follows:

(A) The hearing of an appeal taken in relation to a final order, adjudication, or decision covered by division (A) of section 2506.01 of the Revised Code shall proceed as in the trial of a civil action, but the court shall be confined to the transcript filed under section 2506.02 of the Revised Code unless it appears, on the face of that transcript or by affidavit filed by the appellant, that one of the following applies:

* * *

(2) The appellant was not permitted to appear and be heard in person, or by the appellant's attorney, in opposition to the final order, adjudication, or decision, and to do any of the following:

* * *

(c) Cross-examine witnesses purporting to refute the appellant's position, arguments, and contentions;

* * *

(3) The testimony adduced was not given under oath.

* * *

(5) The officer or body failed to file with the transcript conclusions of fact supporting the final order, adjudication, or decision.

(B) If any circumstance described in divisions (A)(1) to (5) of this section applies, the court shall hear the appeal upon the transcript and

additional evidence as may be introduced by any party. At the hearing, any party may call, as if on cross-examination, any witness who previously gave testimony in opposition to that party.

{¶ 28} The City asserts that BD "waived any procedural defects that occurred at the administrative hearings held on its variance by failing to object during the hearing. Thus, the issues raised [in BD's] motion were not preserved for the appeal to the trial court or this Court." The City directs our attention to *Stores Realty Co. v. City of Cleveland*, 41 Ohio St.2d 41, 322 N.E.2d 629 (1975). At issue therein was "whether unsworn testimony is competent evidence, where the opposing party is represented by counsel who neither requests that the witness be sworn nor objects to the testimony." *Id.,* 42. The Supreme Court of Ohio determined as follows:

The Court of Appeals relied upon this Court's per curiam opinion in [*Arcaro Bros. Builders v. Zoning Board of Appeals*] (1966), 7 Ohio St.2d 32, 218 N.E.2d 179. In that case, the chairman of the Zoning Board of Appeals, at an administrative hearing, "refused permission to have any of the witnesses sworn, and allowed unidentified statements, apparently from the audience attending the hearing, to be recorded in the transcript." This court held that, as a result, the record contained no evidence.

[*Arcaro*] makes clear that it is error for unsworn testimony to be admitted in evidence. However, [*Arcaro*] does not answer the question of whether such error is waived if timely objection is not made.

Ordinarily, errors which arise during the course of a trial, which are

not brought to the attention of the court by objection or otherwise, are waived and may not be raised upon appeal. * * *

Although the issue had never been decided by this court, the rule is well-established that a party may not, upon appeal, raise a claim that the oath of a witness was omitted or defective, unless objection thereto was raised at trial. If no objection was raised, the error is considered to be waived. * * *

Had appellee objected to the unsworn testimony during the hearing, there is little doubt that the chairman would have sworn the witness. By failing to bring the matter to the attention of the board, appellee effectively waived the right to appeal on that ground.

The Court of Appeals relied upon this Court's decision in the [*Arcaro*] case. We now hold that [*Arcaro*] does not apply where no objection is raised to the omission of the oath of a witness.

*Stores Realty Co.*, 42-43. *See also Shields v. City of Englewood*, 172 Ohio App.3d 620, 2007-Ohio-3165, 876 N.E.2d 972 (2d Dist.), ¶16 ("It is well accepted that the failure to administer an oath to witnesses in an administrative proceeding[] is not fatal and that any objection is waived if it is not timely asserted. * * * The trial court should then consider the unsworn testimony as though it were given under oath. * * * ").

**{¶ 29}** BD directs our attention to this Court's decision in *Brown v. City of Germantown*, 2d Dist. Montgomery No. 10984, 1988 WL 98646 (Sept. 23, 1988), which provides as follows:

Where testimony is not taken under oath at the administrative hearing

and appellant failed to object to the failure at such hearing, the necessity for an oath was waived and the trial court is required to consider the unsworn statements. *Zurow v. Cleveland*, 61 Ohio App.2d 14; *Stores Rlty Co. v. Cleveland*, 41 Ohio St.2d 41; *Dudukovich v. Lorain Metro. Housing Auth.,* 58 Ohio St.2d 202.

These decisions do not resolve the instant question posed by the assignments of error: Does the waiver that applies to unsworn statements at the administrative level extend further to waive the statutory right to seek and to introduce additional testimony on appeal before the Court of Common Pleas? It does not.

The statutes governing hearings and appeals in zoning cases are unique and special proceedings, and are clearly an exception to the Civil Rules of Procedure. Rule 1(C) provides that, when clearly inapplicable, the Civil Rules shall not apply to procedure upon appeal to review any judgment or ruling ... and in all other special statutory proceedings.

* * *

If any circumstances described in divisions (A)(1) to (5) of [R.C. 2506.03(A)] applies, the court *shall* hear the appeal upon the transcript and such additional evidence as may be introduced by any party. At the hearing, any party may call, as if on cross-examination, any witness who previously gave testimony in opposition to such party. (Emphasis added).

In this case it is undisputed that the testimony was not given under

oath and the transcript disclosed that the only record of the final adjudication by the Council was that the application was denied. No conclusions of fact were filed. Under these circumstances any party in such appeal has a statutory right (the statute uses the word "shall") to introduce additional evidence on the appeal to the Court of Common Pleas. In addition any party may call on cross-examination any witness who previously gave testimony in opposition. The duty of the court to correct specific deficiencies in the transcript is mandatory. A refusal to do so under appropriate circumstances is clear error, prejudicial or an abuse of discretion, if any discretion exists. *Id*., *1-2.

{¶ 30} This Court noted that *Stores Realty Co.* reversed *Arcaro* and further noted that "*Stores* was not presented with and did not answer the instant question." This Court then reasoned as follows:

> * * * [I]n the instant case the appellant specifically called to the attention of the court by motion that on the face of the transcript none of the witnesses were sworn, an undisputed fact in this case; he presented exhibits not made a part of the transcript, and by two affidavits provided facts sought to be introduced. The trial court found on June 30, 1987 that the affidavits were not appropriate for consideration based mistakenly on the waiver of unsworn testimony at the administrative level. This refusal to consider was error, an abuse of discretion and prejudicial. *Brown*, *3.

{¶ 31} This Court concluded as follows in *Brown:*

These appellate proceedings do not provide for a trial *de novo*; however, in correcting the deficiencies of hearings by lay boards it was the expressed intention of the legislature, and indeed its direct order, that in the situations described the trial court *shall* permit additional testimony. Unsworn testimony is specifically mentioned, along with cross-examination of those who previously testified. Since the unsworn testimony must be considered when there has been a waiver, additional testimony on appeal does not create a traditional trial *de novo* even though in practical terms the time to correct deficiencies may be greater than an original trial. * * *. *Id.*

{¶ 32} As BD points out, this Court's decision in *Brown* was relied upon by the Eleventh District in *Raischel, Inc. v. City of Eastlake,* 11th Dist. Lake No. 97-L-280, 1998 WL 964490 (Dec. 31, 1998). Therein, Appellants filed a "Motion for Hearing upon Transcript and Additional Evidence," due "to the failure of appellee to administer an oath to any of the witnesses, and its failure to include conclusions of fact supporting its decision in the transcript." *Id.*, *1. The trial court did not rule on the motion and "upheld the decision of appellee to deny appellants a conditional use permit." *Id.* The Eleventh District concluded, based upon *Brown*, that while "the appellants may have waived this issue at the administrative level, they were still entitled to raise this issue in their R.C. 2506 Chapter appeal." *Id.*, *3. The Eleventh District remanded the matter for further proceedings. *Id.*

{¶ 33} In contrast, in *Zurow v. City of Cleveland,* 61 Ohio App.2d 14, 399 N.E.2d 92, ¶ 2 of the syllabus (8th Dist. 1978), the Eighth District determined that "[w]hen an administrative agency, such as a board of zoning appeals, acts in a quasi-judicial capacity in

hearing an appeal from a denial of a building permit by a building commissioner it must administer oaths to witnesses. The failure to administer oaths is error. If timely objection is not made this error is waived throughout the entire proceedings, including the appellate level." According to the Eighth District, "[i]n the event that there is no objection to the admission of unsworn testimony at an administrative hearing, the error of allowing this evidence is waived and no additional evidence should be taken by the trial court in an appeal pursuant to R.C. Chapter 2506. [*Stores Realty Co. v. Cleveland*, supra.] The trial court should then consider the unsworn testimony as though it were given under oath." *Id.,* p. 24.

{¶ 34} As this Court noted in *Brown*, *Stores Realty Co*. did not address the issue of whether the waiver that applies to unsworn statements at the administrative level extends to further waive the statutory right to seek and to introduce additional testimony in the trial court on appeal, and we conclude that the Eighth District's reliance upon *Stores Realty Co.* for the proposition that failure to object waives error throughout the appellate process in the trial court is misplaced. We conclude, as in *Brown*, that since it appears on the face of the transcript that the witnesses were not sworn in before the City Council, and since BD brought that fact to the trial court's attention by motion, the court did not err in granting BD's "Motion to Stay Briefing Schedule and to Permit Hearing to Adduce Further Evidence" on that basis. The City's first assigned error is overruled.

{¶ 35} The City's second assigned error, with subparts, is as follows:

> [BD] DID NOT COMPLY WITH THE CITY OF VANDALIA'S
> ZONING CODE BECAUSE IT FAILED TO PAVE WITH CONCRETE,
> ASPHALTIC CONCRETE OR OTHER HARD SURFACE APPROVED BY

AN ADMINISTRATIVE OFFICER.

i. [BD] did not seek administrative approval to use gravel, which is required by the Zoning Code.

ii. The gravel used by [BD] was not a "hard surface" as contemplated by the City's Zoning Code.

iii. Section 1280.10 of the Zoning Code requires that loading areas be paved with concrete or asphaltic concrete.

{¶ 36} As this Court has previously noted:

Administrative appeals to the court of common pleas are governed by R.C. Chapter 2506. In an appeal of an administrative order or decision under this chapter, the trial court is authorized to reverse, vacate, or modify the administrative order if the court finds the decision is "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." R.C. 2506.04; *Parisi v. City of Dayton*, Montgomery App. No. 20045, 2004-Ohio-2739, ¶ 11. Because the trial court must determine whether the decision is supported "by the preponderance of substantial, reliable, and probative evidence," R.C. 2506.04 grants the trial court "extensive power" to weigh the evidence. *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147, 735 N.E.2d 433, 2000-Ohio-493; *Smith v. Granville Twp. Board of Trustees*, 81 Ohio St.3d 608, 612, 693 N.E.2d 219, 1998-Ohio-340.

* * *

The standard of review to be applied by an appellate court is "more limited in scope." *Henley*, 90 Ohio St.3d at 147, 735 N.E.2d 433, citing *Kisil*, 12 Ohio St.3d at 34, 465 N.E.2d 848. Under R.C. 2506.04, the court of appeals does not have the same extensive power to weigh the evidence as is granted to the common pleas court. *Id.* The appellate court's inquiry is limited to questions of law, including whether the trial court abused its discretion[1]. *Id*. at 147-48, 465 N.E.2d 848. "Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." *Henley*, 90 Ohio St.3d at 147, 735 N.E.2d 433, quoting *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 261, 533 N.E.2d 264. *Baker v. Mad River Twp. Bd. of Zoning Appeals*, 2d Dist. Champaign No.2008 CA 16, 2009-Ohio-3121, ¶ 45, 47.

*Oregon Place Assn. v. Walsh-Cotton*, 2d Dist. Montgomery No. 25667, 2013-Ohio-5461, ¶ 9.

{¶ 37} Chapter 1280 of the Codified Ordinance of Vandalia governs off-street parking and loading. Section 1280.08 sets forth the off-street parking standards, and division (g)(1) provides: "The surface of any parking area, aisle, driveway or maneuvering

---

[1] "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990). *Feldmiller v. Feldmiller,* 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

area shall be hard-surfaced, paved with concrete, asphaltic concrete or other hard surface and approved by the Administrative Officer." Section 1280.08(g)(3) provides: "All parking areas shall be designed to include adequate drainage to prevent the rate of increase of surface water onto adjacent properties. The design of all pipe and culvert or water retention areas shall conform to specification contained in the City's standard drawings."

{¶ 38} Section 1280.10 governs off-street loading, and division (d)(1) provides: "All required loading spaces, together with driveways, aisles and other circulation areas, shall be surfaced with concrete or asphaltic concrete to provide a durable dust-free surface."

{¶ 39} We initially note that the decision of the City and the trial court was limited to analysis of the application of Section 1280.08(g)(1) to BD's property, and that application of Section 1280.10 was not argued by the City below or considered by the trial court. Accordingly, we will not consider the application of Section 1280.10 to BD's property for the first time on appeal, as the City has waived this argument.

{¶ 40} Having reviewed the record before us, we cannot find, as a matter of law, that the trial court's decision is not supported by a preponderance of reliable, probative and substantial evidence. In other words, we cannot conclude that the trial court abused its discretion in concluding that BD complied with section 1280.08(g), such that a temporary or permanent variance is not required. The trial court, which had extensive authority to weigh the evidence, expressly credited BD's evidence that the compacted gravel in BD's lots constitutes a "hard surface," and it accepted BD's proof that the gravel surface is "chip and dust, crushed, *hardened concrete aggregate*" that is "holding up better than my blacktop." (Emphasis added). BD's exhibits support the trial court's conclusion; Exhibit 58, as Vann

testified, reflects "not just gravel. That chip and dust it becomes almost concrete." Exhibit 59 reflects an almost imperceptible impression left by a sixty to eighty thousand pound trailer that executed a sharp turn on the surface, while the remaining surface otherwise appears smooth, firm, compacted and unyielding. Finally, we conclude that the City's argument that BD failed to seek approval from the Administrative Officer, such that any hardship in subsequent compliance with the zoning regulation is self-created, is moot, since BD's parking lots comply with Section1280.08(g).

{¶ 41} Further, we note that the trial court, in determining that the surface complies with the zoning provision, did "not reach whether the variance sought ought to have been granted," and further noted that "in making findings as it has regarding the lack of dust, drainage and safety issues, such would appear to be appropriate." *R & I Properties, Inc. v. City of Mason Zoning Bd. of Appeals*, 12th Dist. Warren No. CA93-05-037, 1993 WL 491679 (Nov. 29, 1993), supports the trial court's assessment, as well as BD's arguments regarding the nature of the surface of its parking lots. R & I Properties received a variance to install a gravel lot for its tractor-trailer terminal and storage facility, where the zoning resolution required that parking lots "be paved with a hard surface." *Id.*, *1. According to the Twelfth District:

> Cities may enact zoning regulations that have a substantial relationship to the public health, safety and welfare. However, if these regulations as applied to a particular property are unreasonable, inequitable or have no substantial relation to the public health, safety and welfare, then the owner of the property may be entitled to a variance. * * * To be entitled to an

area variance, * * * the owner must show that he has practical difficulties in complying with the zoning requirements. *Duncan v. Village of Middlefield* (1986), 23 Ohio St.3d 83, certiorari denied (1986), 479 U.S. 986; *Kisil* at 35.

* * * R & I plans to use its property to store huge tractor trailer trucks. The evidence proves that the cost and maintenance of paving the parking lot would cause R & I practical difficulties. Many witnesses opined that the weight of the trailers would cause hard pavement to crumble or cause the trailers to sink into the asphalt in the heat. * * * Witnesses explained that the parties stipulated that a gravel lot is better for handling rain water run off than a paved lot.

* * * The board explained that it received complaints about dust from the lot. However, there were only two complaints. * * *

In order to deny [a] variance request on the basis of public health and safety, the good to the public must outweigh the detriment to the individual property owner. *City of Kettering v. Lamar Outdoor Advertising, Inc.* (1987), 38 Ohio App.3d 16, 17. In this case, some dust in a light industrial area does not harm the public to the extent that R & I's variance should be denied.

*Id*., at *1-2.

{¶ 42} Having found that the trial court did not abuse its discretion in concluding that BD's parking lots are in compliance with Section 1280.08(g), such that a variance is not required, the City's second assigned error is overruled, and the judgment of the trial court is

affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Terry L. Lewis
Michael W. Sandner
Joshua M. Kin
Hon. Gregory F. Singer